IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DANIELLE GRIFFIN[1], | § | |
| | § | No. 110, 2022 |
| Respondent Below, | § | |
| Appellant, | § | Court Below—Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | File No.: 21-06-06TN |
| DEPARTMENT OF SERVICES | § | Petition No.: 20-27942 |
| FOR CHILDREN, YOUTH AND | § | |
| THEIR FAMILIES (DSCYF)/ | § | |
| DIVISION OF FAMILY SERVICES | § | |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: February 8, 2023
Decided: April 21, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, and **VAUGHN**, Justices.

## **O R D E R**

On this 21st day of April 2023, it appears to the Court that:

(1)  The respondent-appellant, Danielle Griffin[1] ("Mother"), appeals from a Family Court order dated March 1, 2022, terminating her parental rights ("TPR") over two of her children, S.L. (born August 5, 2019) and D.L. (born September 20, 2020).  On appeal, the Mother raises two claims.  She first claims that the Family Court erred by finding that statutory grounds for termination exist.  She next claims

---

[1] The mother and children in this case are referred to by way of pseudonyms pursuant to Supr. Ct. R. 7(d).

that the Family Court erred by finding that TPR was in the best interests of the two children. For the reasons that follow, we have concluded that the Family Court's judgment should be affirmed.

(2) On June 2, 2020, the Family Court ordered that S.L. be removed from the care of his parents and placed in the custody of the Department of Services for Children, Youth and Their Families ("DSCYF"). This order came after S.L. "sustained significant injuries"[2] while in the care of the Mother, his father, and S.L.'s paternal grandmother.[3] S.L. has an older sister who went to live with a maternal great-aunt ("Great-Aunt") in Tennessee after S.L. was injured. The older sister was not placed in the custody of DSCYF and her custody is not involved in this proceeding.

(3) S.L.'s injuries resulted in a lengthy hospital stay. At the time of the TPR hearing, the child's medical treatment needs continued to be significant. In July 2020, the Mother received a case plan for reunification with a number of listed goals, one of which was that she "establish and maintain safe and appropriate housing[.]"[4] D.L., the second child involved in this proceeding, was born in September 2020. Three days after her birth the Family Court ordered that she be removed from her parents and placed in DSCYF's custody. The case plan for D.L. was the same as the

---

[2] App. to DSCYF's Answering Br. at B1.
[3] S.L.'s father was later arrested and charged with Child Abuse in the First Degree. S.L.'s father was represented by an attorney during the TPR hearing, but is not a party to this appeal.
[4] App. to DSCYF's Answering Br. at B12.

case plan for S.L.

(4) The Mother experienced difficulty in obtaining suitable housing in Delaware. On June 30, 2021, the Great-Aunt filed a Petition for Permanent Guardianship of D.L. and S.L. At a permanency hearing held on July 22, 2021, the Division of Family Services ("DFS") requested that the permanency plan be changed from Reunification to TPR/Adoption, and Permanent Guardianship.[5] In an order dated July 28, 2021, the Family Court ordered that Reunification, TPR/Adoption, and Permanent Guardianship would all be concurrent goals.

(5) DSCYF's petition for TPR/Adoption and the Great-Aunt's petition for Permanent Guardianship were consolidated and heard by the court on February 28 and March 1, 2022. The Mother's counsel first moved for a stay of the proceeding. The stay was requested on the basis of information obtained by the Mother's counsel that the Great-Aunt had obtained a new lease for a living unit in Tennessee. Apparently, ICPC[6] approval of Great-Aunt's original living unit in Tennessee as a suitable living unit for Permanent Guardianship of D.L. and S.L. had been denied. The Great-Aunt, counsel reported to the Family Court, had obtained a new lease for a larger living unit and the stay was requested to allow her to obtain, or seek to

---

[5] "Once a child has been in the custody of DFS for a period of 12 months, the Family Court must hold a permanency hearing to determine what the goal for the child should be." Office of the Child Advocate, *Training Manual, Chapter Four – How a Case Moves Through the Judicial Process*, 10, Delaware Courts, https://courts.delaware.gov/childadvocate/trmanual/Chapter4_073107.pdf (last visited Apr. 17, 2023).

[6] Interstate Compact on the Placement of Children.

obtain, ICPC approval for that living unit. The Family Court denied the motion to stay.[7]

(6) The taking of testimony commenced with DSCYF calling the Mother, who testified that she had moved from Delaware to Tennessee as she was not having success locating stable housing in Delaware. She testified that she had secured a lease for housing in Tennessee which was set to begin on March 3, 2022. However, ICPC approval of that unit had not been obtained. She also discussed her knowledge of S.L.'s medical needs, her pediatrician and daycare plans in Tennessee, and the family members who lived close by in Tennessee. DSCYF also took testimony from the Great-Aunt, S.L.'s pediatrician, and S.L's foster parent. Counsel for the Mother recalled the Mother and the Great-Aunt for additional testimony. Counsel also called the family interventionist.

(7) While the Family Court recognized the difficulty of the Mother's housing situation, it ultimately found that "DFS has established by clear and convincing evidence that [the Mother] did fail to plan."[8] The Family Court conducted an analysis of the eight best interest factors, which are enumerated in 13 *Del. C.* § 722(a).[9] The first factor was clear—the Mother wanted to be reunited with the

---

[7] The Family Court stated that "these issues can be raised . . . as part of the best interest analysis, as well[,]" and that the motion was untimely. App. to Opening Br. at Appx071.
[8] *Id.* at Appx453.
[9] 13 *Del. C.* § 722(a) states:

children and supported the Great-Aunt for guardianship as a secondary avenue. The second factor was apparently considered a non-factor because the two children were too young to express their wishes. As for the third factor, the Family Court found that there was a bond between the Mother and S.L., but that the bond with the foster family was stronger. The Court also found that D.L. also had a stronger bond with the foster family, as the foster family home was the only home D.L. had ever known. As for the fourth factor, the Family Court concluded that "the only home, school, and community [the children] are adjusted to are where their foster families are."[10] On the fifth factor, the Family Court found "no concerns with [the Mother's] health"[11] but found that the Mother was not prepared to provide care for S.L.'s

---

(a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:
   (1)  The wishes of the child's parent or parents as to his or her custody and residential arrangements;
   (2) The wishes of the child as to his or her custodian or custodians and residential arrangements;
   (3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabitating in the relationship of husband and wife with a parent of the child, and any other residents of the household or persons who may significantly affect the child's best interests;
   (4) The child's adjustment to his or her home, school, and community;
   (5) The mental and physical health of all individuals involved;
   (6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title;
   (7) Evidence of domestic violence as provided for in Chapter 7A of this title; and
   (8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.

[10] App. to Opening Br. at Appx454.
[11] *Id.* at Appx456.

medical needs which "were brought on by child abuse."[12]  With respect to the sixth factor, the Family Court found that the Mother was not prepared to deal with S.L.'s serious medical needs.  On factor seven, the Family Court stated that domestic violence was not an issue with the Mother.  On factor eight, the Family Court did not find any criminal record warranting concern about the Mother.  The court concluded that clear and convincing evidence existed that it was in the children's best interest to terminate the parents' rights so that the children could be free for adoption.[13]

(8) When reviewing the decision of the Family Court to terminate parental rights, this Court conducts a "review of the facts and law, as well as the inferences and deductions made by the trial court."[14]  "Conclusions of law are reviewed *de novo*."[15]  "To the extent that the issues on appeal implicate rulings of fact, we conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly wrong."[16]  "Moreover, this Court will not substitute its own opinion for the inferences and deductions made by the Trial Judge where those inferences are supported by the record and are the

---

[12] *Id.* at Appx457.

[13] The Great-Aunt's petition for permanent guardianship was dismissed due to her failure to obtain ICPC approval of her residence in Tennessee and her failure to file a social report as required by 13 *Del. C.* § 2354.

[14] *Powell v. Dep't of Servs. for Child., Youth and their Fams.*, 963 A.2d 724, 730 (Del. 2008).

[15] *George v. Dep't of Servs. for Child., Youth and their Fams.*, 2016 WL 6302525, at **4 (Del. Oct. 27, 2016) (ORDER).

[16] *Powell*, 963 A.2d at 731.

6

product of an orderly and logical deductive process."[17] Our review is limited to an abuse of discretion when the trial judge has correctly applied the appropriate law.[18]

(9) The Mother first claims that the Family Court erred by finding that statutory grounds for termination exist.[19] She argues that the Family Court erred by failing to give her proper "credit for substantially complying with her case plan"[20] when it determined by clear and convincing evidence that the Mother failed to plan.[21] The Mother argues that the Family Court noted her "significant progress on her case plan" such that reunification was not removed as a goal.[22] The Mother argues that her testimony that "she was transitioning and preparing for S.L.'s medical needs in Tennessee" should not have been outweighed by her inability to name all of S.L.'s specialists.[23] The Mother claims the record supports her assertion that she had worked to obtain and maintain suitable housing for the children, but had been prevented from obtaining appropriate housing in Delaware due to circumstances outside her control.[24] Specifically, the Mother notes that, even though she was working full time making $13.50 per hour, she was unable to receive a Delaware State Rental Assistance Program voucher for housing "because reunification had not

---

[17] *Solis v. Tea*, 468 A.2d 1276, 1279 (Del. 1983).
[18] *Powell*, 963 A.2d at 731.
[19] Opening Br. at 17.
[20] *Id.* at 3.
[21] *Id.* at 17.
[22] *Id.* at 20.
[23] *Id.*
[24] *Id.* at 20-21.

7

occurred, yet she cannot get reunification without housing."[25]  The Mother also points to statements by the Family Court recognizing the difficulty of obtaining housing in Delaware[26] to support her contention that she had "no choice but to look for housing in Tennessee[.]"[27]  The Mother additionally complains of the Court's denial of her motion to stay.[28]  The Mother explains that she "was very close to establishing . . . housing" and that granting the motion would allow assessment of the Great-Aunt's new house and "would allow the Children to begin a transition to Tennessee and ultimately, reunification with [the Mother]."[29]  The Mother claims that the Family Court "undermined the significance" of "[the Great-Aunt's] testimony of the new lease, as well as [the Mother]'s new living arrangement[.]"[30] Finally, the Mother takes issue with the Family Court's suggestion that she "could have moved to Tennessee earlier in order to comply with her case plan" on the grounds that doing so would have resulted in a sacrifice of her visitation time.[31]

(10)  We find no merit to the Mother's first claim.  The Family Court's determination that statutory grounds existed for TPR is supported by the record. The Mother was never able to maintain suitable housing for any sustained length of

---

[25] *Id.* at 20.
[26] *Id.* at 21, *citing* App. to Opening Br. at Appx458.
[27] Opening Br. at 20-21.
[28] *Id.* at 21.
[29] *Id.* at 21.
[30] *Id.*
[31] *Id.* at 21-22; *see* App. to Opening Br. at Appx453.

time, and the record supports the Family Court's finding that the Mother failed to obtain and maintain adequate housing as required by her DSCYF case plan. While the Family Court did acknowledge that the Mother faced difficulties outside her control pertaining to her situation and housing difficulties,[32] we will not disturb the Family Court's ultimate decision that there existed "clear and convincing evidence of failure to plan on the part of [M]other[;]"[33] and the children had been in the care of DSCYF for a period of one year. Those findings satisfy the statutory requirements for TPR.

(11) The Mother's second claim is that the Family Court erred when it found that termination was in the best interest of the children.[34] First, the Mother claims the Family Court improperly weighed the third best interest factor under 13 *Del. C.* § 722(a) when it failed to analyze the bond that the children "can develop with not only their mother, but also their oldest sibling and their maternal aunt."[35] Additionally, the Mother claims that, in response to the Family Court's finding on the fourth factor, that the "Mother was never given the opportunity to establish a

---

[32] App. to Opening Br. at Appx451-53.
[33] *Id.* at Appx450-51; *see id.* at Appx506.
[34] Opening Br. at 34.
[35] *Id.* at 25-26; *see supra* note 9. Furthermore, the Mother states that "the oldest child constantly asks to spend time with her younger siblings and is anxious to see them." *Id.* at 26. The Mother additionally makes an argument that her situation differs from that in *Powell v. Dep't of Servs. for Child., Youth and their Fams.*, a case in which this factor was weighed against a mother. *Id.* at 25-26, *citing* 963 A.2d 724 (Del. 2008).

9

home for D.L., as D.L. was taken into DFS custody at just ten days old."[36] Furthermore, the Mother claims, in response to the Family Court's analysis on the fifth factor, that she had found a primary doctor in Tennessee who could help her locate specialists for S.L., and that her "lack of medical knowledge did not prevent her from understanding the hurdles that S.L. must overcome."[37]

(12) We find no merit to the Mother's second claim. The Family Court's conclusion that it was in the children's best interest for the Mother's parental rights to be terminated is supported by the record. The Family Court made factual findings as to relevant best interest factors contained in 13 *Del. C.* § 722(a), and found the third, fourth, and fifth best interest factors did not weigh in the Mother's favor. The Family Court "may give different weight to different factors when balancing the best interest factors."[38] The Family Court did not abuse its discretion in weighing these factors against the Mother.

NOW, THEREFORE, it is the order of the Court that the judgment of the Family Court is AFFIRMED.

BY THE COURT:

/s/ James T. Vaughn, Jr.
Justice

---

[36] Opening Br. at 26; *see supra* note 9.
[37] Opening Br. at 27; *see supra* note 9.
[38] *Bower v. Dep't of Servs. for Child., Youth and their Fams./Div. of Fam. Servs.*, 142 A.3d 505, 2016 WL 3382353, at **4 (Del. June 9, 2016) (ORDER).